**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| **United States of America,** | **Criminal No. 08-330 (MJD/JJG)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Jian Wei Ding, (1)** **Kok Tong Lim, (2)** | |
| Defendants. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This matter came before the undersigned on January 8, 2009 for resolution of pretrial motions. David J. McLaughlin, Assistant United States Attorney, appeared for the Government. Richard Haynes, Esq., and Andrew S. Birrell, Esq., appeared for defendant Jian Wei Ding. Piper K. Webb, Esq., appeared for defendant Kok Tong Lim. The defendants' motions to suppress are referred for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(b).

Through motions to suppress statements (Doc. Nos. 36, 60, 88), the defendants contend that officers took his statement in violation of his privilege against self-incrimination. Mr. Ding also has a motion to suppress evidence (Doc. Nos. 59, 89) that is being considered in a separate report and recommendation from Magistrate Judge Arthur J. Boylan.[1] For all remaining motions

---

[1] This motion to suppress arises out of a search warrant this Court authorized on December 17, 2008. To prevent any concerns regarding impartiality, this issue is being decided by another magistrate judge.

to suppress (Doc. Nos. 57, 58), there are no issues to be decided and these motions are properly denied.[2]

## I. BACKGROUND

The defendants in this matter are charged with conspiracy to violate export regulations, in violation of 50 U.S.C. § 1705, and other crimes. Briefly put, the defendants allegedly conspired to export certain forbidden materials from the United States to China. The accused transactions were arranged through companies based in Singapore, among them Firmspace, Far Eastron, and Jowa Globaltech.

The defendants are both Singaporean nationals. To entice the defendants into the United States, where they would be subject to prosecution, government agents used a "lure" procedure. Posing as a front company, agents promised the defendants more business if they would come to the United States. Responding to the lure, Mr. Lim (Lim) arrived at the JFK airport on October 6, 2008 and Mr. Ding (Ding) arrived at the Newark airport on October 21, 2008.

Both were detained at the airports upon their arrival. The defendants' motions arise out of statements they made during that detention.

---

[2]   In his motions to suppress evidence (Doc. Nos. 59, 89), Mr. Ding does not specify the evidence to be suppressed or specify a particular legal argument for suppression. At the motion hearing on January 8, 2009, Mr. Ding represented that he was seeking review of a search warrant, and his counsel introduced it into evidence. As the preceding footnote indicates, that issue is being decided by another magistrate judge. But in his subsequent briefing on January 21, 2009, Mr. Ding also challenges an arrest warrant. He did not clearly identify this question at the January 8 motion hearing, and neither he nor the Government introduced the arrest warrant into evidence. This Court will not consider, therefore, whether to suppress evidence from this arrest warrant. *See United States v. Starks*, 193 F.R.D. 624, 627 (D.Minn. 2000) (noting that motion to suppress must be "sufficiently definite, specific, detailed and nonconjectural to enable the court to conclude that contested issues of fact are at question" (quotation omitted)); *United States v. Quiroz*, 57 F.Supp.2d 805, 811, 822-23 (D.Minn. 1999) (ruling that motion to suppress be denied where the defendant does not adequately specify legal or factual basis for suppression).

### A. Detention of Mr. Lim

Lim arrived at JFK around 11 a.m. He was intercepted by government agents, who took him to an interrogation room. At approximately 12:35 p.m., two men joined Lim in that room: Mark Knoblock, a special agent in Immigration and Customs Enforcement (ICE); and David Nardella, a special agent in the Office of Export Enforcement.

According to Knoblock, Nardella also asked Lim whether he understood English. Lim said that he did, adding that "of course" he spoke English as he was a university-educated man from Singapore. From prior investigation—including several audio recordings—Knoblock also was aware that Lim transacted business in English without any difficulty. As a result, Knoblock believed that Lim was fluent in English.

Knoblock then gave Lim a *Miranda* warning in English, asking whether he understood those rights. Lim said that he did. Knoblock then asked Lim whether he wanted to waive those rights and talk. Lim assented. After receiving this assent, Nardella explained that Lim could ask them to stop questioning at any time. The interrogation continued until about 1:10 p.m., during which Lim made several incriminating statements. He did not invoke his *Miranda* rights.

Before and during the interview, Knoblock observed that Lim was tired. Lim otherwise did not appear to be intoxicated, or in any other discomfort, and he was lucid and responsive to questioning. There were no threats, promises, or coercion, and the incriminating statements were not induced by deception.

### B. Detention of Mr. Ding

Ding arrived at Newark around 6 p.m. After he passed customs, government agents also took him to an interrogation room, where he was met by Nardella and Knoblock.

Nardella started the encounter by asking Ding whether he spoke English. According to Knoblock, Ding responded that he spoke English but was not wholly fluent, and that his native tongue was Mandarin. To ensure no subsequent misunderstanding, the agents invited Hsueh Lin, another special agent with ICE, into the room. Lin, who is fluent in Mandarin, greeted Ding in that language and Ding responded in kind.

According to Knoblock, Ding may have then proposed that Lin translate to Mandarin only as necessary. But Lin himself did not recollect whether Ding made such a proposal. In any event, Nardella explained that Lin was available to translate as necessary.

Continuing in English, Nardella inquired about Ding's identity. At the time, Nardella and Knoblock had obtained an arrest warrant for a "Will Ting," but had come to believe this name might be an alias for Ding. They had initially obtained Ding's passport, which showed that he was Jian Wei Ding. To verify identity, Nardella asked some questions to corroborate whether Ding and "Ting" were one and the same.

During this questioning, Nardella asked Ding whether he went by other names, and Ding answered that he went by "Will." Nardella also asked Ding some questions about his employers, and Ding said that he worked for two firms: Superior Coat and Far Eastron. Because Ding used the name "Will," and because Far Eastron was implicated in the investigation, the agents were satisfied that Ding was the one they were seeking.

By this point, the interview had continued for about nine minutes, and Nardella decided to give Ding a *Miranda* warning. Nardella gave Ding an advice of rights form, which included a complete *Miranda* warning in English and Mandarin. Nardella read each paragraph aloud in English, and then Lin read the same paragraph aloud in Mandarin. According to Knoblock, Ding sometimes nodded during the reading, as if to indicate his understanding.

4

After this reading, however, Ding evidently expressed some confusion and asked about his right to an attorney.  As a result, the agents went through the advice of rights form a second time; the record does not indicate whether the agents completely reviewed the entire form in both English and Mandarin.  Emphasizing that Ding had the right to stop questioning and ask for an attorney, the agents asked Ding whether he understood.  According to Lin, Ding said "yes" in Mandarin.  Ding also signed the form.

Nardella then asked Ding if he wanted to talk.  According to Knoblock, Ding answered "okay, fine" in English, and Nardella proceeded with questioning in English.  Lin and Knoblock both observed that Ding had no difficulty understanding or responding to questions.  Knoblock was also aware, from his prior investigation, that Ding had authored several e-mails in English.  And during the ensuing interview, Nardella asked Ding questions about some of those e-mails.

After the *Miranda* warning, the questioning went on for about twenty-five minutes.  In this questioning, Nardella asked some questions that involved Far Eastron, but otherwise none of the inquiry involved any matters discussed prior to the *Miranda* warning. At around 7 p.m., Nardella showed Ding another e-mail.  After admitting that he was the author of the e-mail, Ding asked in English for an attorney, and the agents ceased questioning.

Nardella then told Ding he was under arrest.  Ding responded with a blank stare, which led Nardella to believe that Ding might be confused about what was said.  So Nardella asked Lin to translate, and in Mandarin, Lin again told Ding he was under arrest.  According to both Lin and Knoblock, this was the only point where Ding appeared to have any difficulty understanding English.

Throughout the interview, Ding was responsive. According to Knoblock, Ding exhibited no physical discomfort; there were no threats, promises, coercion. And during the interview, no fraud or deception was employed to induce incriminating statements.

## II.   ANALYSIS

The defendants' arguments are founded on the Fifth Amendment privilege against self-incrimination. It requires that, once law enforcement takes a suspect into custody, that suspect must receive a *Miranda* warning prior to police interrogation. *United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005).

### A.   Questioning of Ding Prior to the *Miranda* Warning

Ding argues, in part, that the agents violated this privilege by conducting interrogation before giving a *Miranda* warning. The Government responds that, because the questions were for the purpose of establishing identity, they are not deemed interrogation within the scope of the privilege. And it elsewhere implies that, because Ding was an entrant at the border, the privilege against incrimination did not attach. (Plf.'s Mem. at 2 (indirectly quoting *United States v. Gupta*, 183 F.3d 615, 617 (7th Cir. 1999)) ("A person seeking entry into the United States does *not* have a right to remain silent[.]"))

#### 1.   Questioning of Border Entrants

The threshold question here is whether and when the privilege against self-incrimination attaches for incoming entrants. Federal courts uniformly agree that, when border agents conduct routine questioning of incoming entrants, the privilege against self-incrimination does not attach and no *Miranda* warning is required. *See, e.g., United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992); *see also United States v. Kiam*, 432 F.3d 524, 529 (3d Cir. 2006).

6

The underlying rationale is that border controls focus on whether entrants have legitimate reason to enter the country, not whether those entrants have committed a crime. *See, e.g., United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988) (en banc) (distinguishing routine border checks from investigatory restraints associated with custodial interrogation).

But where an encounter is no longer focused upon entry, and instead on the investigation of a crime, it may ripen into the sort of custodial interrogation where the privilege against self-incrimination attaches. The issue then becomes the point at which the ripening occurs, when the entrant must be given a *Miranda* warning. *See generally United States v. Gupta*, 183 F.3d 615, 619 (7th Cir. 1999); *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996).

The only significant discussion from the Eighth Circuit on these matters comes from its decision in *United States v. Layne*. 973 F.2d 1417 (8th Cir. 1992). It ruled that questioning by border officials will ripen into custodial interrogation where (1) there is probable cause to believe that the entrant has committed a crime and (2) the entrant reasonably believes that he or she is not free to leave. *Id.* at 1420 (quoting *United States v. Estrada-Lucas*, 651 F.2d 1261, 1265 (9th Cir. 1980)).

Turning to the current circumstances, this Court will assume for the sake of argument that Ding reasonably believed he was not free to leave.[3] The critical question, therefore, is the point at which agents had probable cause to believe that Ding committed a crime.

---

[3] This element of the Eighth Circuit rule echoes, but does not fully comport with, the standard for determining custody in the context of the privilege against self-incrimination. In this context, the usual inquiry is whether a reasonable person, under similar circumstances, would understand the situation to be an arrest. *See United States v. Martinez*, 462 F.3d 903, 908-09 (8th Cir. 2006).

This inconsistency highlights one difference between the Eighth Circuit rule and those of other circuits. When considering whether a border entrant is subject to custodial interrogation, most courts have treated this issue as one about custody. *See, e.g., Kiam*, 432 F.3d at 528-29; *United States v. Galloway*, 316 F.3d 624, 629-30 (6th Cir. 2003). But the Eighth Circuit rule,

Prior to the encounter, the agents had an arrest warrant for "Will Ting." But they had yet to determine whether the man named in the warrant, and the man they had intercepted in the Newark airport, were one and the same. Until then, there was no probable cause to believe that Ding had committed any crimes, and similarly, no sufficient reason for agents to proceed with interrogation about alleged crimes.

When Ding admitted he sometimes went by "Will," it may have created some additional suspicion, but that single thread was not enough to support a reasonable belief he was the one in the warrant. It was only when Ding mentioned his employment with Far Eastron, and implicated himself in the criminal scheme, that the agents acquired probable cause.

Only after that point could the privilege against self-incrimination attach. And the agents then promptly satisfied the privilege by immediately providing a *Miranda* warning. As a result, the statements that preceded the warning need not be suppressed.

## 2.     Interrogation and Ministerial Questioning

Assuming that the privilege does attach, the Government argues in the alternative that the questions were for the purpose of establishing identity, and so there was no interrogation within the scope of the privilege.

The underlying standard is that, where an officer engages in express questioning or its functional equivalent, there is interrogation. This standard includes words or actions by officers,

---

and the Ninth Circuit cases it is derived from, do not clearly frame the issue this way. *Compare Layne*, 973 F.2d at 1420 (setting out the Eighth Circuit rule), *with Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969) (setting out the original Ninth Circuit rule).

One of the underlying purposes of the privilege against self-incrimination, however, is to protect a suspect from coercive questioning about alleged crimes. *See generally Miranda v. Arizona*, 384 U.S. 436, 469-70 (1966). This Court accordingly emphasizes the probable-cause requirement from *Layne*, which is more germane to whether agents' questioning goes to crimes rather than entry.

8

aside from those normally incident to custody, which the officers know are likely to cause an incriminating response.  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

As routine identification questions are normally incident to custody, they are not deemed interrogation, even where those questions have the potential to reveal incriminating evidence. *See United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985).  In such circumstances, no judicial scrutiny is necessary except where officers had reason to be aware the questioning is "directly relevant" to criminal charges.  *Id.* at 391-92.

Consistent with these principles, the Eighth Circuit has determined that no interrogation occurs in scenarios such as booking during arrest, *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir. 1992), or ministerial interviews by probation officers, *United States v. Jones*, 266 F.3d 804, 812 (8th Cir. 2001).  And as noted in the preceding discussion, routine questioning of border entrants is not subject to the privilege against self-incrimination.  *United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992).

Taken together, these rules indicate that routine questioning of a border entrant is among the sort of ministerial tasks that do not constitute interrogation.  Thus the relevant issues here are whether the agents were asking routine questions, or whether they had reason to be aware that their questions were directly relevant to criminal charges.

The record shows that the agents asked Ding typical questions about his identity and his reason for coming to the United States.  Although the question regarding his employment had the potential to cause an incriminating admission, this ordinary question was not directly relevant to the criminal charges.  As a result, this line of questioning did not constitute interrogation under the privilege against self-incrimination.  Thus even if the privilege did attach, Ding's statements need not be suppressed.

B.  **Waiver of the Privilege Against Self-Incrimination**

The defendants also present a common argument: that after receiving *Miranda* warnings, they did not waive their privilege against self-incrimination, and thus any subsequent statements must be suppressed. They both contend that, because they had difficulty understanding English and the rights in the *Miranda* warning, their respective decisions to permit questioning were not valid.

To determine whether a defendant has waived the privilege against self-incrimination, the waiver must be intelligent and voluntary. *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). For waiver to be intelligent, the defendant must be fully aware of the rights being abandoned and the consequences of waiver. *Perry v. Kemna*, 356 F.3d 880, 887 (8th Cir. 2004). For waiver to be voluntary, the defendant must make a free choice that is not the product of coercion or deception. *United States v. Ortiz*, 315 F.3d 873, 884 (8th Cir. 2002).

Where a defendant has another native language, but demonstrates sufficient proficiency in English, a court may find the defendant has sufficient understanding to make an intelligent waiver. *United States v. Shan Wei Yu*, 484 F.3d 979, 985-86 (8th Cir. 2007). And where a defendant signs a waiver form in her or his native language, and a government agent is present to translate and answer questions about the meaning of the form, such circumstances also support a finding of intelligent waiver. *United States v. Gallardo*, 495 F.3d 982, 991 (8th Cir. 2007).

For both defendants, the record soundly establishes intelligent waiver. The record shows that Lim had no difficulty communicating in English and that he frequently conducted business in that language. The same is true for Ding. And his intelligent waiver is further confirmed by the fact that he signed a waiver in both English and Mandarin; and that he successfully invoked

his right to counsel in English. In these circumstances, both defendants were well advised of their rights and the consequences of waiver.

The record also establishes a voluntary waiver. There is simply no evidence that agents employed coercion or deception to get the defendants to talk.

Ding frequently implies that the lure procedure, by which agents induced him to enter the United States, has tainted his statements. But this implication has no merit. Notwithstanding the initial deception that was used to entice Ding, the deception ended at the point he was advised of his rights. The agents provided a complete *Miranda* warning and candidly explained that Ding had no obligation to talk to them.

Because both defendants' waivers were valid, their subsequent statements did not violate the privilege against self-incrimination. Their motions to suppress, therefore, are appropriately denied.

## III.   CONCLUSION

To the extent Ding was questioned before the *Miranda* warning, it occurred in the context of ordinary questioning by border agents. Because the agents had yet to acquire probable cause that Ding committed a crime, the privilege against self-incrimination did not attach. Assuming it did, the agents' questioning was not interrogation subject to the privilege. Ding's statements prior to the *Miranda* warning, therefore, did not violate the privilege and need not be suppressed.

To the extent the defendants were questioned after their *Miranda* warnings, both made an intelligent and voluntary waiver. Their ensuing statements also do not violate the privilege and no suppression is required here either. This Court thus concludes that the defendants' motions to suppress statements should be denied.

**IV.   RECOMMENDATION**

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. The defendants' motions to suppress statements (Doc. Nos. 36, 60, 88) be **DENIED.**

2. The defendants' other motions to suppress (Doc. Nos. 57, 58) be **DENIED.**

Dated this 3rd day of February, 2009.              /s     *Jeanne J. Graham*

JEANNE J. GRAHAM<br>United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **FEBRUARY 17, 2009.** A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.